IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DERRICK LAKEY,

      Petitioner,                                      No. CIV S-05-1864 JAM GGH P

    vs.

RODERICK HICKMAN,

      Respondent.                              <u>FINDINGS & RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner represented by counsel proceeding on an original petition for writ of habeas corpus. Petitioner challenges his 1996 conviction for one count of murder (Cal. Penal Code § 187), two counts of attempted murder (Cal. Penal Code § 664/187(a)), one count of assault with a semi-automatic firearm (Cal. Penal Code § 245(b)) and one count of being a felon in possession of a firearm (Cal. Penal Code § 12021(a)). Petitioner is serving a prison sentence of 46 years and four months to life.

        Petitioner raises the following claims in his challenge: 1) his conviction was based on a case interpretation of law that was applied ex post facto; and 2) improper jury instructions. Petition (Pet.) at 10, 12.

\\\\\\

1

After carefully considering the record, the court recommends that the petition be denied.

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 495, 117 S. Ct. at 1519. "Contrary to' clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III. Background

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

> The victim, Calvin Willis, was standing on the sidewalk near the intersection of Flint Avenue and Georgia Street in the Conway Homes area of Stockton in the evening of September 4, 1995; with him were his sister Tashambe Willis and his cousins Tubiya McCormick and Simon McCormick.  Tubiya McCormick held a can of beer in one hand.
>
> Soon after the four met and began talking, a dark car drove up.  Defendant McCoy

was driving the car and defendant Lakey was in the front passenger seat. Some witnesses testified that Matthew McGee and Patrick Hall were in the back seat.

When he saw the car drive up, Simon McCormick became nervous, and moved behind a tree. As McCoy leaned out of the window and shouted "What's up now nigger," a flurry of shots was fired from the car toward the group. Witnesses saw McCoy and Lakey shooting handguns.

Tubiya McCormick was shot in the chest, but survived. At trial, Tubiya McCormick testified that he turned toward the car after he heard someone say "What's up nigger," and was immediately shot. Calvin Willis was fatally shot in the back of the head as he tried to run away. Tashambe Willis and Simon McCormick were not shot.

During the melee, one or more persons outside McCoy's car began returning fire, and bullet casings were found afterward near the tree where Calvin Willis and his family had been standing. Lakey was shot and survived. Police questioning Lakey at the hospital found him evasive about the circumstances of his injury, although he eventually stated he had been shot while walking alone in a different part of Stockton.

Defendants McCoy and Lakey, together with Matthew McGee, were charged in the shooting and tried together.

The prosecution's theory of the case was that the Willis shooting was an intended retaliation in an ongoing feud between two Stockton gangs referred to as the "Southside Mob" (also referred to as "Southside Gangsters," "South Mob" or "Southside") and the "Conway Homes Gangsters" or "Conway." In the prosecution's view, the victims were not gang members, but innocent bystanders.

Stockton Police Officer Michael Townes testified as a gang expert and opined that the Willis shooting was a gang-related retaliation attempt, and explained that his opinion was based upon the location of the shooting, the parties involved, and the existence of a recent ongoing feud between Southside Mob and Conway Homes. The intersection of Flint and Georgia, where Willis was killed, is claimed by Conway and is a central location for gang activity. Officer Townes testified that McCoy, Lakey, McGee, and Patrick Hall are South Mob Gangsters; other witnesses also testified that McCoy and Lakey are members of the Southside Mob.

To show that the Willis shooting was precipitated by a string of recent gang shootings, the prosecution offered evidence of several other events. On August 30, less than a week before the Willis shooting, near the intersection of Flint and Georgia, someone from a passing car fired shots at Cheri Mitchell and Calvin Mitchell[1]; Alton Burton was with them. Calvin Mitchell and Alton Burton are "high profile" Conway gang members. The next night, Hammam Noel, who is not a gang member, was shot from a passing car when he was in the company of Calvin Mitchell in the vicinity of Flint and Georgia. The car from which the shots

---

[1] Calvin Mitchell and Calvin Willis are second cousins.

were fired at Hammam Noel crashed and its occupants fled on foot; the car was registered to Patrick Hall and contained Hall's fingerprints and those of defendant McGee. Officer Townes testified he had investigated the shooting of Jonathan Martin, a member of the South Mob, which occurred early on September 4, the same day Willis was killed. Alton Burton pleaded guilty to his involvement in the Martin shooting.

Finally, McCoy's cousin, Latroy Taylor, testified that shortly before Willis was shot, he and McCoy drove past the intersection of Flint and Georgia in McCoy's car. Someone fired a handgun toward the car, which made McCoy angry and upset.

A cellmate of Lakey's after his arrest testified that Lakey admitted participating in a drive-by shooting in which he had shot someone in the head for revenge.

The bullets recovered from Calvin Willis's body were .380 caliber and all were fired from the same gun. McCoy was the only one firing .380-caliber ammunition from the car. DNA factors consistent with those in Lakey's blood were found on the front passenger seat and floor of McCoy's car; the chances of all such factors existing in the same person in the African-American population is one in 720,000. The blood in McCoy's car could not have been his own.

Of the defendants at trial, only McCoy testified. He admitted shooting Calvin Willis, but denied that he had done so as retaliation against Conway Homes gang members; rather, he testified he had fired his gun because he believed he was himself going to be shot.

McCoy testified he had ceased to be a member of the Southside Mob after 1993, was not a gang member at the time of the Willis shooting, and was unaware of the recent shootings involving Hammam Noel and Jonathan Martin.

In the afternoon of the Willis shooting, McCoy drove his cousin Taylor to a friend's house in Conway; on the way he passed the corner of Flint and Georgia, where he saw a group of people standing. After they passed the intersection, McCoy noticed gunshots had been fired in his direction from the group. When he returned home, he decided to return to Conway, seek out his friend Calvin Mitchell, whom he knew to have influence in the Conway neighborhood, and ask him to find out who had been shooting at McCoy and to use his influence to stop it. McCoy brought along his gun for protection, picked up Lakey and drove to Conway. He knew Lakey also had a gun. McCoy testified that neither defendant McGee nor Patrick Hall was with them.

Across the street from Calvin Mitchell's house, McCoy saw three men standing near a tree, and because he thought one man with his back to the car might be Mitchell, he drove slowly toward the group, stopped the car and called out "What's up nigger" to get their attention. He denied that the statement was a challenge or a threat. When he saw one of the three dart behind the tree, McCoy testified he got nervous. When the person McCoy thought was Mitchell turned around, McCoy saw that it was not Mitchell and that the man had a "dark something" in his left hand which appeared to be a gun. McCoy, believing that the person McCoy thought was Mitchell "was going to shoot [him]," grabbed his

5

own gun from the seat next to him and fired. Although McCoy did not know for certain whether the object in the man's hand was a gun before he began firing, when he saw a flash of shots coming toward him from the man's direction, McCoy continued to fire his gun from the car until the gun was empty. Lakey also fired his gun out the window of McCoy's car.

When Lakey cried out that he had been shot, McCoy drove Lakey to the hospital. That night, McCoy learned from his mother that Calvin Willis was one of the men shot.

McCoy admitted he lied to the police about whether he and Lakey were present when Calvin Willis was shot, lied when he denied shooting Willis, and lied when he denied that Lakey was shot.

People v. McCoy, 93 Cal. Rptr.2d 827, 831-833 (2000).

IV. <u>State Court History</u>

On July 12, 1996, petitioner and co-defendant McCoy were found guilty in the Superior Court of the State of California, County of San Joaquin. Petitioner and McCoy appealed to the California Court of Appeal, Third District, and on November 30, 1998, the court of appeal reversed McCoy's conviction for murder and attempted murder due to a prejudicial jury instruction on imperfect self-defense.[2] Pet. at 3. Petitioner's convictions were affirmed on the ground that McCoy testified, raising the issue of self-defense, while petitioner did not testify. <u>Id</u>. Petitioner requested a rehearing and the court of appeal issued a decision on March 17, 2000. The court granted petitioner the same relief that it had granted McCoy, reversing the murder and attempted murder convictions and providing the People with the option of accepting a judgment of voluntary and attempted voluntary manslaughter. People v. McCoy, 93 Cal. Rptr.2d 827 (2000) The court held that:

> "(1) under California law, a defendant who is tried as an aider and abettor cannot be convicted of an offense greater than that of which the actual perpetrator is convicted, where the aider and abettor and the perpetrator are tried in the same trial upon the same evidence, and (2) on this record, we cannot conclude with reasonable certainty that any participant acted with malice in connection with counts 1, 2, and 4, so we cannot say that the crime of murder or attempted murder have been committed."

---

[2] The People were given the option of retrying McCoy on these counts or accepting a reduction to voluntary manslaughter and attempted voluntary manslaughter.

6

Id. at 838.

On April 25, 2000, the People filed a petition for review with the California Supreme Court seeking to overturn the judgments as to both defendants. On June 25, 2001, the California Supreme Court issued a decision reversing the court of appeals as to petitioner, but affirming the disposition and grant of relief to McCoy and remanded the matter for further proceedings. People v. McCoy, 25 Cal. 4th 1111 (2001). This decision forms the analytical basis of the petition and will be discussed at length herein.

On remand the Court of Appeal, Third District, issued a decision on May 7, 2002, that reaffirmed the reversal for McCoy because of instructional error with respect to imperfect defense but held that this instructional error did not prejudice petitioner because petitioner did not testify that he was acting in self defense. People v. McCoy, 2002 WL 864283. The court also held that pursuant to the California Supreme Court's decision, petitioner's state of mind as an aider and abettor was independent of McCoy's state of mind and the jury found that petitioner acted with malice. Id.

On June 17, 2002, petitioner sought review in the California Supreme Court to determine if the court's ruling in People v. McCoy was so unforeseeable that to apply it to petitioner retroactively would violate due process. Pet. at 5. Petitioner's request was summarily denied. Id.

V. Argument & Analysis

Claim 1 - Ex Post Facto Violation

Petitioner contends that the convictions for first-degree murder and attempted murder violated the Fourteenth Amendment because the application to him of the rule of law announced in People v. McCoy, 25 Cal.4th 1111, was ex post facto. Pet. at 10.

The Ex Post Facto Clause of Article I, Section 9, by its terms, applies only to changes in the law resulting from legislative or executive action, but the Court has extended similar principles to the Due Process Clause to cover "unforeseeable [judicial] construction of a

7

criminal statute." Bouie v. City of Columbia, 378 U.S. 347, 354-55, 84 S.Ct. 1697 (1964). This court will analyze this claim as a due process violation.

*Legal Standard*

Under federal law, "[a]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the federal due process right to fair warning of what constitutes criminal conduct." Clark v. Brown, 450 F.3d 898, 911 (9th Cir. 2006) (citing Bouie v. City of Columbia, 378 U.S. 347, 353, 84 S.Ct. 1697 (1964)). Under Bouie and subsequent cases, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." United States v. Lanier, 520 U.S. 259, 266, 117 S.Ct. 1219 (1997). The "touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Lanier, 520 U.S. at 267, 117 S.Ct. at 1225. Bouie determined that if "a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' [the construction] must not be given retroactive effect." Bouie, 378 U.S. at 354, 84 S.Ct. at 1703.

The rationale of Bouie and its progeny rests on the core due process concepts of notice, foreseeability, and the right to fair warning of criminal penalties. Rogers v. Tennessee, 532 U.S. 451, 459, 121 S.Ct. 1693 (2001). Bouie is not violated unless judicial construction of a criminal statute represents a "radical and unforeseen" departure from former law. Webster v. Woodford, 369 F.3d 1062, 1069 (9th Cir.2004). "Radical" might have a somewhat negative connotation, and other cases have simply focused on the "unforseeability" of the new decision. "The 'crucial test' is 'whether the construction actually given the statute was foreseeable.'" McSherry v. Block, 880 F.2d 1049, 1053 (9th Cir.1989) (citation omitted); see also Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989) ('an unforeseeable, albeit legitimate, construction of a state law by the courts may not be retroactively applied to a defendant.') Clark v. Brown, 450 F.3d at 911 (9th Cir. 2006).

1  The California Supreme Court held on direct appeal in the instant case that an
2  aider and abettor can be convicted of a crime greater than that committed by the direct
3  perpetrator. People v. McCoy, 25 Cal. 4th 1111 (2001). Petitioner argues that prior to the
4  California Supreme Court's decision, it was well settled California law that an aider and abettor
5  could not be liable for a crime greater than that committed by the direct perpetrator.[3] Pet. at 11.
6  Petitioner contends that this ruling was an unforseen change in the law of aiding and abetting and
7  applying the new law retroactively to petitioner was a violation of due process. Id.

8  This claim was denied without a reasoned opinion by any state court. If a state
9  court denies constitutional claims without a reasoned decision, a federal court reviewing a habeas
10 corpus application pursuant to § 2254(a) "ha[s] no basis other than the record for knowing
11 whether the state court correctly identified the governing legal principle or was extending the
12 principle into a new context." Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000). "While
13 Supreme Court precedent is the only authority that is controlling under AEDPA, we look to
14 Ninth Circuit case law as 'persuasive authority for purposes of determining whether a particular
15 state court decision is an "unreasonable application" of Supreme Court law.' " Luna v. Cambra,
16 306 F.3d 954, 960 (9th Cir.2002). Thus, pursuant to Delgado, the Court must conduct an
17 independent review of the record to determine whether the state court's decision was objectively
18 unreasonable. In Delgado, the Ninth Circuit held that, "Federal habeas review is not de novo
19 when the state court does not supply reasoning for its decision, but an independent review of the
20 record is required to determine whether the state court clearly erred in its application of
21 controlling federal law." 223 F.3d at 982; see also Luna, 306 F.3d at 954 (quoting Fisher v. Roe,
22 263 F.3d 906, 915 (9th Cir. 2001) (internal citation omitted) ("We reverse only if 'a careful
23 review of the record and the applicable case law leaves us with the "firm conviction" that the
24 state court was wrong.' ")).

---

[3] The one exception being if the aider and abettor was tried in a separate trial.

9

If the point needs further emphasis, the undersigned will not address the correctness, wisdom and so forth of the reported California Supreme Court McCoy decision which held that an aider and abettor could be held liable for a more serious crime than the principal. That is a given for this petition. This case is solely concerned with the silent denial of the state supreme court to petitioner's assertion that the McCoy holding could not be retroactively applied to his case, i.e., that the "new" decision was Bouie barred, and whether that silent denial was an unreasonable application of established [U.S.] Supreme Court authority.

In People v. McCoy, the California Supreme Court analyzed California cases over the last one hundred years regarding aider and abettor liability. Respondent contends that McCoy was not a change in California law, "rather the California Supreme Court harmonized prior California jurisprudence with the McCoy decision." Answer to Writ at 15. For the reasons set forth below, this court must sound in counterpoint to respondent's argument, but hold that the fact that Lakey's conduct could in no way be considered un-criminal permits McCoy's retroactive application to petitioner.

In McCoy, the California Supreme Court attempted to illustrate how previous decisions supported the holding in McCoy that an aider and abettor could be guilty of a greater offense than the principal offender. However, this was complicated by the many decisions that specifically stated an aider or abettor cannot be guilty of a greater offense than the principal offender. People v. Williams, 75 Cal. App.3d 731, 737 (1977); People v. Antick, 15 Cal.3d 79, 89 (1975); People v. Alsip, 268 Cal. App. 2d 830, 831-832 (1969); People v. Petruzo, 13 Cal. App. 569, 577 (1910); People v. Sidelinger, 9 Cal. App. 298, 299 (1908).

The McCoy court attempted to overcome this wall of authority by finding that those cases had not dealt with a situation precisely like the one at hand, or that certain cases, like People v. Williams, supra had actually found the "aider and abettor" guilty of the murder charge, even though the actor who caused the death had been found not culpable. The problem in the Bouie sense is that Williams found the defendant a *principal* in its situation *because* the aider

10

and abettor was the direct cause for the death (she had told the shooter to shoot the victim) and aider and abettor liability was not possible under the law. The outcome in the Williams case, although perhaps some support for the rule enunciated in McCoy, cannot be viewed as support for the rule itself in terms of its legal discussion.

Also used by the McCoy court as "implied support" case for the "new" rule was the case of People v. Taylor, 12 Cal. 3d 686 (1974).

> Our conclusion finds implied support in People v. Taylor (1974) 12 Cal.3d 686, 117 Cal.Rptr. 70, 527 P.2d 622. There we held that collateral estoppel prohibited the trial of a person alleged to be vicariously liable for murder when the alleged direct perpetrator had previously been acquitted of the same murder. (See People v. Palmer (2001) 24 Cal.4th 856, 866, 103 Cal.Rptr.2d 13, 15 P.3d 234.) We distinguished other cases because in those cases "identity of the issue was lacking." (People v. Taylor, supra, 12 Cal.3d at p. 692, 117 Cal.Rptr. 70, 527 P.2d 622.) As an example, we cited cases in which "the accomplice was acquitted because of the lack of a culpable mental state for reasons personal only to the accomplice...." (Id. at p. 692, fn. 6, 117 Cal.Rptr. 70, 527 P.2d 622.) We also noted that the direct perpetrator "did not offer a defense such as insanity, intoxication, or duress based on his personal lack of culpability irrespective of the criminality of his acts." (Id. at p. 697, fn. 13, 117 Cal.Rptr. 70, 527 P.2d 622.) This language implies that if the direct perpetrator had been acquitted due to a defense personal to him, the aider and abettor, who had no such defense, might nonetheless have been guilty of the murder, i.e., have been guilty of a greater crime than the direct perpetrator.

McCoy, 25 Cal. 4th at 1121.

As is clear, the result of Taylor is antithetical to the rule announced in McCoy. And while the undersigned does not quibble with the state supreme court that "implied support" can be structured in hindsight out of the distinguished cases (cases on a different topic than aider and abettor liability), this hardly stands as support to believe that the distinguished cases in a case on a different topic forecasted the rule in McCoy.

The state supreme court also relied on two legal writers who believed that an aider and abettor could have a "free floating" liability independent of the principal, but California cases had not relied on these writers for such a proposition prior to McCoy.

In McCoy, the California Supreme Court acknowledged that People v. Croy, 41 Cal.3d 1 (fn5) (1985) caused confusion, stating:

11

> Our discussion in People v. Croy, supra, 41 Cal.3d at page 12, footnote 5, 221 Cal.Rptr. 592, 710 P.2d 392, contained language that has caused some confusion: "It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which Beeman holds must be found by the jury." This statement was part of a discussion of liability for an *unintended* crime under the natural and probable consequences doctrine. Our reference to the "target offense" should more accurately have been to the charged crime. When the charged crime and the intended crime are the same, i.e., when guilt is not predicated on the natural and probable consequences doctrine, the aider and abettor must, indeed, share the actual perpetrator's intent.

People v. McCoy, 25 Cal. 4th 1111, 1118, fn. 1 (2001) (emphasis in original).

The state supreme court had to overrule the previous cases holding that aider and abettor liability could not be greater than that of the principal for "any interpretation" "inconsistent with this opinion." McCoy at 1123. Of course, the universal interpretation within those overruled cases was that aider and abettor liability could not be greater than that of the principal – because that is what the cases actually said.

Finally, the defense, and apparently all concerned at the trial, understood the law as providing that an aider and abettor could not be more liable than the direct perpetrator, and no one advanced a theory that the aider and abettor could have a "free floating" intent divorced from the direct perpetrator. RT 5453, 5454, 5457 ("Here's the theory, Judge, that as an aider and abettor the person cannot be convicted of anything greater than the perpetrator... The jury cannot convict, for instance, Mr. McCoy of voluntary manslaughter or involuntary manslaughter and under an aiding and abetting theory convict Mr. Lakey of murder."); 5534, 5663-5666. Certainly, no jury instruction was given to this effect.

It might seem at this point that there is not much in favor to argue that Bouie was reasonably determined inapplicable by the California Supreme Court in the later habeas filing. However, in the case of McSherry v. Block, 880 F.2d 1049 (9th Cir. 1989), the Ninth Circuit placed a more stringent definition to "unforeseeable" when the issue was not "innocent" conduct later found criminal and applied to a defendant's case, but rather a situation where the conduct at issue was indisputably criminal, but that the "unforeseeable" court ruling had exacerbated its

seriousness.

The Eighth Circuit was confronted with a similar situation involving a habeas challenge to a retroactive judicial interpretation of a state criminal statute. In Knutson v. Brewer, supra, petitioner had been convicted of kidnapping for ransom under Iowa Code § 706.3. That statute required that the victim be held for ransom, and that ransom could be "any money, property, or thing of value." Evidence at trial showed that petitioner had kidnapped the victim, forced her to commit sodomy, and released her after a short period of time. The Iowa Supreme Court held that obtaining sexual gratification constituted a "thing of value" within the meaning of the kidnapping for ransom statute, and that petitioner was therefore properly convicted of this crime, instead of the lesser offense of simple kidnapping. On habeas appeal, petitioner argued that the current construction of the Iowa statute was so unexpected as to violate his right to fair notice under the due process clause of the fourteenth amendment. In determining that the state court's construction was not unforeseeable, and that "[petitioner] took the risk that the [state court] would construe the statute as it did," the Eighth Circuit stated:

> [W]e think it significant that the issue of construction involved here is not the drawing of a line between legal conduct and illegal conduct. What [petitioner] did was unlawful under any interpretation of Iowa law, and he makes no contention to the contrary.... When a person does an act that he well knows to be a violation of some law, and when a statute is later interpreted to cover his conduct in a way that does not do violence to the ordinary understanding of the English language, the Fourteenth Amendment is not offended.

Knutson, 619 F.2d at 750 (emphasis added). See also Welton v. Nix, supra (subsequent state court interpretation of criminal statute deemed foreseeable on similar basis).

This case is thus further distinguishable from that of Bouie. FN7 Here, there was no danger that a person pursuing what would otherwise be purely innocent behavior could be ensnared by the statute with no warning whatsoever. The Appellate Department did not interpret the statute to encompass what had heretofore been "innocent" conduct. Appellant's actions in this case were far from innocent, and, as will be indicated, had for more than a quarter of a century been made criminal in the state of California. Under such circumstances, it simply cannot be said that appellant had no fair warning that the particular conduct in which he was engaged was punishable. See Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973) ("even if the outermost boundaries of [the statute] may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions and appellants concede as much").

FN7. The Supreme Court in Bouie specifically noted that "the petitioners' conduct cannot be deemed improper or immoral." Bouie, 378 U.S. at 362, 84 S.Ct. at 1707.

McSherry, 880 F.2d 1055.

\\\\\

13

The Ninth Circuit held that "considerable emphasis" should be placed on the factor of whether the conduct at issue was unlawful in any event when considering a Bouie claim. Id.

Of course, in petitioner's situation, he had to know that going to the scene armed with a concealed weapon, and firing his weapon at another human being without complete legal justification was punishable as some type of murder/manslaughter.

In light of the standards that guide AEDPA review, especially after consideration of McSherry, the undersigned cannot find that the silent denial of petitioner's Bouie claim was an unreasonable application of Supreme Court precedent.

Even if the undersigned is incorrect, however, about the weight of McSherry to the Bouie issue, for the reasons discussed in the next section, the error was harmless.

Claim 2 - Jury Instructions

Petitioner contends that the convictions violated the Fourteenth Amended because the jury was not instructed that malice aforethought had to be found as the state of mind of petitioner independently of the state of mind of co-defendant McCoy. Pet. at 12.

The California Court of Appeal, Third District also reversed petitioner's convictions due to improper jury instructions with respect to petitioner's state of mind as an aider and abettor. The court held:

> Lakey's convictions for murder and attempted murder cannot be affirmed because, as the jury was actually instructed in this case, no participant may be said to have acted with malice.
>
> Section 187, subdivision (a) provides, "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."
>
> Malice is an essential element of murder. (People v. Hansen (1994) 9 Cal.4th 300, 307-308, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) "[A] killing cannot become murder in the absence of malice aforethought." (People v. Mattison (1971) 4 Cal.3d 177, 182, 93 Cal.Rptr. 185, 481 P.2d 193, followed in People v. Dillon (1983) 34 Cal.3d 441, 465, fn. 11, 194 Cal.Rptr. 390, 668 P.2d 697.) Moreover, the crime of attempted murder requires express malice. (People v. Carpenter (1997) 15 Cal.4th 312, 391, 63 Cal.Rptr.2d 1, 935 P.2d 708.) The jury was so instructed in this case.

14

As the jury was actually instructed in this case, we cannot say with confidence that either defendant acted with malice. Hence, we cannot say with confidence that the crimes of murder or attempted murder were committed.

We have already seen that defendant McCoy received an improper instruction on imperfect self-defense. A correct instruction could have entitled the jury to conclude that McCoy did not act with malice. Consequently, we cannot say with confidence on this record that McCoy acted with malice.

Nor, upon the instructions actually given, was the jury required to determine that Lakey acted with malice.

Thus, the jury was instructed on aiding and abetting as follows:

"Now, the persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:

"One, those who directly and actively commit or attempt to commit the act constituting the crime;

"Or, two, those who aid and abet the commission or attempted commission of the crime.

"A person aids and abets the commission or attempted commission of the crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator and, two, with the intent or purpose of committing, encouraging or facilitating the commission of the crime by act or advice aids, promotes, encourages or instigates the commission of the crime.

"Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

"Mere knowledge this is a crime is being committed [sic] and the failure to prevent it does not amount to aiding and abetting."

This instruction merely required the jury to determine that Lakey had "knowledge of the unlawful purpose of the perpetrator" and the intent of "committing, encouraging or facilitating the commission of the crime." It did not require the jury to find that Lakey acted with malice.

Nor did other instructions. For example, the jury was instructed that the jury had to find a certain specific intent or mental state in the mind of the perpetrator (but not in the mind of an aider and abettor) as follows:

"In the crimes and allegations charged in Counts 1, 2, 3 and 4 or which are lesser crimes described thereof, namely, murder, voluntary manslaughter and attempted murder or manslaughter there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime or allegation to which it relates is not committed.

"I've already given you those specific intent [sic]. This specific intent required

15

has been included in the definition of the crimes or allegations which I just read to you.

"In the crimes charged in Counts 1, 2, 3 and 4, namely murder and attempted murder there must exist a union or joint operation of act or conduct and a certain mental state *in the mind of the perpetrator*. Unless such mental state exists, the crime to which it relates is not committed.

"And again the mental states required are included in the definitions of the crimes which I have must read." (Italics added.)

In short, as the jury was actually instructed, the jury was not required to find that Lakey, as an aider and abettor, harbored malice.

We note that the jury was instructed on these principles in accordance with California law. As will appear, there is no requirement under California law that an aider and abettor of a murder must harbor malice. Thus, "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not this specific intent that is an element of the target offense, which ... must be found by the jury. [Citation.]" (People v. Croy, supra, 41 Cal.3d at p. 12, fn. 5, 221 Cal.Rptr. 592, 710 P.2d 392, followed in People v. Mendoza (1998) 18 Cal.4th 1114, 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.) It follows that a defendant who aids and abets a murder need not act with malice; it is sufficient that an aider and abettor "encourage and bring about conduct that is criminal." (People v. Olguin (1994) 31 Cal.App.4th 1355, 1379, 37 Cal.Rptr.2d 596; see People v. Padilla, supra, 11 Cal.4th at p. 920, 47 Cal.Rptr.2d 426, 906 P.2d 388.)

Since, on this record, we cannot say the jury properly found that either McCoy or Lakey acted with malice aforethought, we cannot say that the crimes of murder or attempted murder have been committed, and Lakey's convictions must be reversed along with McCoy's.

People v. McCoy, 93 Cal. Rptr.2d 827, 840-841 (Cal. App.).

The California Supreme Court reversed the Court of Appeal and held that, "to the extent the jury based its verdict as to Lakey on his personal acts, it necessarily found malice. To the extent it based it on McCoy's acts-finding that Lakey aided and abetted those acts-it necessarily found that Lakey knew of McCoy's unlawful purpose and intended to commit, encourage or facilitate that purpose." People v. McCoy, 25 Cal. 4th 1111, 1122. The California Supreme Court attributed the difference with the court of appeal's decision, once again on the

confusion surrounding the mental state needed for an aider and abettor in Croy. Id.

The clearly established law of the Supreme Court is not difficult to decipher. One has the right not to be convicted of a crime unless the state proves all elements of the crime beyond a reasonable doubt, In re Winship, 386 U.S. 358 (1970), and that the jury must be instructed on all elements of the crime. United States v. Gaudin, 515 U.S. 506, 522-523, 115 S.Ct. 2310, 2319-20 (1995). If the jury is not properly instructed, the court must then engage in a harmless error analysis which is whether the asserted error had a "substantial and injurious" effect on the verdict. California v. Roy, 519 U.S. 2, 117 S.Ct. 337 (1996). *The court is not "limited to a review of the facts necessarily found by the jury,"* Pollard v. White, 119 F.3d 1430, 1434 (9th Cir. 1997), but may engage in its own review of the record. Id.

Given the record as a whole, it seems to the undersigned beyond doubt that the California Supreme Court conflated the requirement that one be instructed on all elements of the offense beyond a reasonable doubt and if not, whether that error was harmless. The undersigned will therefore assume that the error in instruction applicable to McCoy, also applied to Lakey under the traditional notion of aiding and abetting, i.e., one cannot be more liable as an aider and abettor than was the direct perpetrator. The error however does appear to be harmless under the standards set forth in Roy.

If the only crime at issue were the murder of Calvin Willis, who was indisputably shot by McCoy and not petitioner, it would be difficult to find that the defective jury instructions related to McCoy's imperfect self-defense would not also affect petitioner. Aiding and abetting was the only viable theory available against petitioner for the Willis murder. There would be no way for a court to determine that the jury may have assessed a "free floating" malice state of mind to petitioner. However, the Willis murder was not the only crime at issue. The jury also found petitioner guilty of attempted murder which possesses the very same malice requirement. And, despite the first opinion of the California appellate court to the contrary, it is not reasonable to assume that the jury thought petitioner an aider and abettor for the attempted murders –

petitioner was as direct a participant in the attempted murders as McCoy.  Because there is no evidence whatsoever that petitioner believed self-defense, imperfect or otherwise was necessary, as petitioner introduced no evidence on the subject of his state of mind, no defect in the imperfect self-defense instructions could be said to have affected the jury's attempted murder findings about petitioner.  The malice instruction given for the attempted murders did not distinguish between McCoy and petitioner.  It follows that because the jury found an independent malice state of mind for petitioner vis-a-vis attempted murder, it becomes logical, as found by the California Supreme Court, to believe that the same independent finding was made for the Willis aiding and abetting charge.

Any failure to instruct on the "free floating" theory of intent for an aider and abettor was harmless under the circumstances.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: 03/04/09

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

ggh:ab
lake1864.hab